# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| TIMOTHY MYERS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 08-CV-2220** |
| | ) | |
| ILLINOIS CENTRAL RAILROAD | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case comes before this court on Defendant Illinois Central Railroad Company's Motion to Bar Plaintiff's Physicians from Giving Expert Causation Opinions (#38), Motion to Bar the Expert Opinion of Tyler Kress (#49), and Motion for Summary Judgment for Lack of Causation Evidence (#42). For the following reasons, all three motions are GRANTED.

## PROCEDURAL BACKGROUND

Plaintiff, Timothy Myers, filed his three count Complaint (#1) against Defendant on September 19, 2008, alleging that Defendant's actions/negligence caused multiple cumulative injuries (to Plaintiff's back, neck, right knee, left elbow, and hips) via: (1) Defendant's violation of the Federal Employers Liability Act (FELA) (45 U.S.C. § 51) (Count I); (2) violations of 49 C.F.R. 213 (Count II); and (3) Defendant's violation of the Locomotive Inspection Act (49 U.S.C. § 20701) (Count III).[1]

---

[1]On page 2 of Plaintiff's Response and Memorandum In Opposition to Defendant's Motion for Summary Judgment for Lack of Causation Evidence (#58) Plaintiff seems to concede

Defendant filed its Motion to Bar Plaintiff's Physicians from Giving Expert Causation Opinions (#38) on September 14, 2009. Plaintiff filed his Response (#55) on October 6, 2009 and Defendant filed its Reply (#66) on November 30, 2009. Defendant filed its Motion to Bar the Expert Testimony of Tyler Kress (#49) on September 25, 2009. Plaintiff filed his Response (#57) on October 8, 2009, and Defendant filed its Reply (#67) on November 30, 2009. Defendant filed its Motion for Summary Judgment for Lack of Causation Evidence (#42) on September 14, 2009. Plaintiff filed his Response (#58) on October 8, 2009, and Defendant filed its Reply (#62) on October 22, 2009. The motions are now all fully briefed and ready for ruling.

## I.     MOTIONS TO BAR TESTIMONY

### A.     Motion to Bar Plaintiff's Physicians from Giving Expert Causation Opinions (#38)

Plaintiff disclosed to Defendant ten "treating doctors" as "non-retained experts" who may give causation opinions in this case. They are Drs: Newlin, Lipinski, Nord, Smith, Jamal, McMullin, Schoedinger, Haueisen, Dusek, and Matthews. The only three doctors who told him that his injuries have anything to do with his work are Drs. McMullin, Schoedinger, and Haueisen. Plaintiff conceded that Drs. Dusek, Newlin, Lipinski, Nord, Smith, Jamal, and Matthews had either not yet been deposed or they would not be rendering causation opinions in the case. Therefore, Defendant's Motion to Bar concerns only Schoedinger, McMullin, and Haueisen.

**Dr. McMullin** (right knee):

---

Defendant's point that summary judgment should be granted as to Counts II and III of the Complaint (#1) because of Plaintiff's counsel's representation that this is a "straight cumulative trauma case" and not a "whole body vibrations case." Therefore, the court finds that summary judgment is appropriate as to Counts II and III of the Complaint, leaving Count I, the FELA claim, still pending.

McMullin believes that Plaintiff has degenerative arthritis in his right knee and has diagnosed him with right knee osteoarthritis.  Plaintiff advised McMullin that his right knee pain was related to chronic work activity.  McMullin, however, could not quantify the forces Plaintiff's knees would have been subjected to while working for the railroad but he believed there were increased forces due to the type of railroad work Plaintiff did.  McMullin has read epidemiological studies (but he could not remember their names) that look into the work activities of a railroad conductor that show there are increased forces over time from walking on ballast, climbing and getting off trains.  McMullin has treated other injured employees of Defendant and confirmed that Plaintiff's right knee degenerative arthritis is attributable, at least in part, to Plaintiff's work exposures at the railroad due to an overuse syndrome.

McMullin admitted he was not an expert in ergonomics.  After performing arthroscopic surgery in early 2006 no meniscal tear was found but Plaintiff had damage to the joint surfaces of the patella and medial femoral condyle.  McMullin admitted that there was no way to tell how long that condition had existed.  Many things could have caused the arthritic changes in Plaintiff's right knee, including trauma, genetics, aging, body weight, and shape of the knee or legs.  Rheumatoid arthritis and "other activities" Plaintiff might have been involved with could have also played a role.  McMullin was also unaware of two prior right knee injuries Plaintiff suffered in 1980 and 1998 (Plaintiff had surgery for the 1998 injury).

McMullin also did not know about Plaintiff's activities outside of work, such as his ATV riding, about which McMullin admitted he did not know what stresses ATV riding put on the knee but that it was "probably not the best thing."  Plaintiff also did not tell McMullin that any specific activity at work aggravated any knee condition or that the condition arose as a result of

any specific activity. McMullin testified that "I think he felt [the right knee pain] may have been related to the chronic work activity." However, McMullin could not assign any specific percentage as to how much of Plaintiff's alleged injury was caused by his work at the railroad as opposed to the prior, pre-existing injuries.

McMullin never observed the work of Plaintiff, or any conductor, for Defendant. He has not performed any kind of study as to what Plaintiff did at Defendant. He does not know where Plaintiff worked, what tracks he worked on, what train runs he went on, or whether his work involved yard work or work out on the road. He also could not quantify any of the forces applied to Plaintiff's knees while working as a conductor. McMullin said there were "increased forces" due to the type of work Plaintiff did. He also could offer no information about quantifiable forces with regard to ATV riding. He has not compared the forces Plaintiff would be subjected to as a conductor against those outside of work. McMullin could not name the studies he read about the work activities of a conductor, nor was he aware of any literature that says how long or over what period of time a particular job activity of a conductor must be performed to be at risk for developing knee pain. McMullin also has not personally published any studies or performed any kind of testing to prove the hypothesis that degenerative arthritis is somehow caused by work as a conductor.

**Dr. Haueisen** (Left Elbow):

Dr. Haueisen, a board certified orthopedic surgeon who specializes in treating the upper extremities, has authored or co-authored several publications and papers. He began treating Plaintiff in May 2006 for left elbow symptoms of tingling and numbness. Plaintiff advised Haueisen he was a switchman/trainman employee for Defendant for the past 28 years and they

discussed various job duties such as connecting air hoses, setting brakes, throwing switches, and repeatedly climbing up and down ladders. Haueisen has seen multiple brakemen/switchmen employees in the past for medical treatment and has seen hundreds of railroad workers over the years and has a good understanding of what brakemen/switchmen employees do. He has seen videos of railroad employees lacing air hoses and setting handbrakes and has talked with railroad patients about the job of throwing switches. He has also treated a fair number of railroad workers who developed cubital tunnel syndrome.

On July 20, 2006, Plaintiff underwent surgery performed by Haueisen on his left elbow for cubital tunnel syndrome and medial epicondylitis. Haueisen testified that Plaintiff's employment tasks and work environment at the railroad contributed to the development of his injuries. Haueisen reached this opinion even though Plaintiff did not tell him he associated his pain with any particular work activity.

Haueisen also testified that he does not know any details about Plaintiff's performance of his work tasks. He just got a "rough idea" of what Plaintiff did at work. Like McMullin, Haueisen never went out to Plaintiff's work site to do an inspection or take measurements, nor has he gone to the job site of any patient to measure the forces of their work. Haueisen knows nothing about Plaintiff's particular work with air hoses and has never seen any data from anyone else who measured the forces involved with lacing an air hose. He has not seen any literature associating Plaintiff's injuries with lacing air hoses. Haueisen is equally unfamiliar with Plaintiff's work with handbrakes, except for a video of a possibly different railroad he saw "years ago." He also has unfamiliarity with the particular nature of Plaintiff's work with switches.

Haueisen also does not know anything about Plaintiff's physical activities outside of work, such as ATV riding or weight lifting. Haueisen has never published anything on the incidence of Plaintiff's conditions amongst railroad workers nor has he seen any studies by anyone else who looked at these conditions in association with railroad work. When asked about how much time he spent discussing Plaintiff's work history with him, Haueisen responded:

"Oh, I would say relatively little because, again, really the thrust of my business is to find out what his problems are and what we think can be done about them. So, again, I'm seeing him as a medical doctor, not as a – you know, seeing him for a work history type of story. So, you know, my charge – I would have spent more time on that. Since that was not my charge, it was really just to get a rough idea of what kind of things he did.

And, again, I've seen, you know, hundreds of railroad workers over the years. So I have a pretty good understanding myself of what brakemen and switchmen do. So there was no need to go into excessive detail on that."

**Dr. Schoedinger** (Neck and Back):

Schoedinger is an orthopedic surgeon who has authored and co-authored numerous publications in his field of medical specialty, which involves the spine. He first began treating Plaintiff in September 2006 for neck pain and headaches. During this first visit Plaintiff informed Schoedinger that he was a long term employee of Defendant as a switchman. Schoedinger is aware of the employment duties of Plaintiff with Defendant. Plaintiff was revealed to have cervical and lumbar spine defects following MRIs. Schoedinger treated the lumbar spine defects with surgery in 2008.

Schoedinger has provided medical treatment to thousands of railroad employees, including brakemen and conductors. He has read and reviewed the "Lawshe Reports" which set forth employment tasks performed by railroad employees in various crafts and he has reviewed peer-reviewed literature published by Dr. Eckardt Johanning concerning engineers and conduct that are subject to vibration riding on trains. He has looked at and treated railroad conductors for a number of years and based on his vast experience, he believes that a portion of their job related activities contributes to the wear and tear changes that are seen in their necks and backs. With regard to Plaintiff, Schoedinger believes that a part of Plaintiff's cervical and lumbar spine injuries are attributable to his long standing work history with the railroad which has imposed significant stresses on his back. Also, Plaintiff sustained an aggravation of a preexisting difficulty due in part to his railroad work.

Schoedinger is not an expert in the field of ergonomics. Schoedinger did not review Plaintiff's deposition nor had he been provided with any medical records from any other healthcare provider who has seen Plaintiff, including the 1987 back problems. Schoedinger only learned of Plaintiff's prior back injury because Plaintiff's attorney informed of him of the injury approximately three to four weeks before the deposition. After viewing a CT scan from 1987 and a MRI from 2008 of the same area, Schoedinger acknowledged that the current injury represented an aggravation of a preexisting condition. Schoedinger could not quantify the amount of change however, or how much of the change could be attributed to Plaintiff's work for Defendant. Plaintiff and Schoedinger also did not discuss Plaintiff's work activities, outside of Schoedinger being aware of what Plaintiff did for a living.

Schoedinger also was not completely clear on what Plaintiff did at work, stating he

believed Plaintiff was a "over-the-road driver or switchman" when Plaintiff had actually been a conductor since 1991.

Further, Schoedinger was similar to Haueisen and McMullin in not doing any quantification of forces regarding Plaintiff's work. He also was not aware of Plaintiff's outside of work ATV riding. Schoedinger had "thumbed through" a report he characterized as a compilation of studies that claimed that the act of getting on and off trains and throwing switches imposes stress on the upper limbs as well as the neck and lower back. He had not read any published articles on the activities, and the length of those activities, of a conductor being a cause of lower back or neck pain.

B.    Motion to Bar the Expert Opinion of Tyler Kress (#49)

Tyler Kress is an expert in the field of biomedical and biomechanical engineering and ergonomics who would testify regarding the mechanism of injury to Plaintiff. Defendant asks that Kress be barred because his theories as to the cause of Plaintiff's alleged cumulative trauma injuries and the risk factors present in the workplace lack reliability and are speculative.

**Tyler Kress**

Tyler Kress is a board certified industrial ergonomist who has taught engineering safety at the University of Tennessee for 23 years. He has consulted in litigation and non-litigation related matters. He has over 100 publications and presentations to his credit regarding engineering and safety issues on topics such as biomechanical engineering and accident reconstruction. He has extensive experience with the railroad industry.

On June 7, 2009, Kress filed his report in this case. In the report Kress lists his extensive qualifications and experience, which are not in doubt. The report also contains the following:

Material Reviewed: Kress reviewed the available material in the case, including the Complaint, discovery answers, and the medical reports of Drs. Schoedinger, McMullin, and Haueisen. He writes that "[i]n developing my opinions and preparing this report, I have relied on these case-specific materials and activities, in addition to my background, education, experience, and personal library."

Findings/Opinions and Information Regarding Plaintiff's Work at the Railroad: Plaintiff's work at the railroad involved various activities that required repetitive use of his musculoskeletal system including upper and lower extremities and back/neck. He performed various tasks including hanging on railcars and riding, throwing switches, tying brakes, coupling air hoses, and climbing and dismounting from railcars. Kress has observed this type of work on the railroad on several occasions and found that there are risk factors present that are associated with musculoskeletal problems such as wear and tear in the elbows, knees, and hips and back/neck pain.

Knowledge and Notice Regarding Ergonomic Risk Factors: Kress has reviewed "voluminous" amounts of scientific literature regarding workplace risk factors and the injuries sustained by Plaintiff. Through this literature, it is known that the back/neck and upper and lower extremities can sustain "overuse" or "cumulative" damage due to "mechanical exposures." Kress was relying on "numerous" scientific peer-reviewed publications and sources such as OSHA, the National Institute of Occupational Safety and Health, the Center for Disease Control, etc.

Lack of Proper Ergonomic Assessments/Improvements: Kress believes Defendant failed to perform comprehensive worksite and job evaluations to assess risk factors present in

Plaintiff's job.  Defendant also failed to implement an ergonomics program that included proper methods training.  Defendant failed to apply appropriate job design procedures creating an unsafe work environment for Plaintiff.  Defendant put their workers in an unreasonably hazardous environment by requiring them to work in the manner Plaintiff worked.

More Opinion Comments:

1) Risk Factors: Plaintiff's work exposed him to ergonomic risk factors consistent with the development of his injuries, including walking on larger irregular ballasts, getting on/off moving equipment, throwing switches, applying handbrakes, and coupling air hoses.

2) Getting On and Off Moving Locomotives and Walking on Uneven Ballast: Kress believes requiring Plaintiff to perform those tasks in those conditions is "bad engineering practice" and not consistent with OSHA standards under 29 U.S.C. § 654(a)(1).  Citing to the Burlington Northern 1992 ergonomics report, the forces and hazards associated with getting off and on equipment, recommend that new techniques be developed to minimize the hazards.  Stopping movement is an effective way to significantly reduce the number of injuries.  Most major railways stopped the practice of getting on and off moving railcars 20 years ago.

Tyler Kress was deposed on September 15, 2009.  Kress has published two articles/abstracts specifically dealing with railroad workers and the railroad industry.  Kress has relied on evidence and testimony from other railroad employees who also sustained cumulative trauma injuries under circumstances "similar" to those of Plaintiff.  From speaking to other railroad employees, Kress has knowledge about the frequency that Defendant's employees had to get on and off moving rail stock, which he believes is similar to that experienced by Plaintiff.  During past site inspections Kress has thrown track switches and climbed up and down railcars.

He has data associated with measurements as to the force required to throw track switches, tie handbrakes, and lace air hoses.  He has taken pictures and measurements of ballast sizes.  He has relied on studies discussing musculoskeletal disorders and cumulative trauma risks involving slips, falls, trips, and the walking environment and risks associated with some of the tasks Plaintiff performed.  Kress confirmed that the employment tasks of railroad brakemen/conductors are the same for all Class I railroads so it is not necessary to conduct a case specific site inspection as analysis of these employment tasks in one case are equally applicable to the case at hand.  Plaintiff claims that Kress has provided trial testimony in more than 30 railroad cases since May 2004 where many of his opinions were identical to the methodology he has employed in the instant case.

During the deposition, Kress testified that he visited some of the areas where Plaintiff worked and performed a site inspection at Defendant's Decatur and Clinton, Illinois yards in August 2007.  The visit involved a work site analysis and taking photographs in cases similar (but not related to) Plaintiff's. Kress took measurements during his August 2007 site inspection and has data that speaks to the measurements of forces railroad conductors are exposed to while performing their employment tasks. He did not measure the forces involved in any work tasks, document the frequency of any such tasks, or do any time and motion studies.  No one was performing work at the time of this inspection.  There is no data in any exhibits regarding any measurements he took at this inspection.

 As for the switches, handbrakes, and air hoses Plaintiff used, Kress has measurements from prior studies and from other employees at the railroad, but nothing specifically from what Plaintiff himself worked on.  Kress has admitted that some brakes, switches, and air hoses are

more difficult than others and can vary in terms of forces and measurements.

The 1992 Burlington Northern study Kress relies on involves a work activity, getting on and off moving rail stock, that was done at all railroads (including Defendant) at the time the study was published.  In regard to the forces involved in mounting and dismounting, Kress relies on the 1992 Burlington Northern study.  However, this study did not use force plates and was a study of Burlington Northern employees on Burlington Northern property.  The study used a method that characterized the postures and the speed and the positions of the body parts as it relates to body weights.  Distance and velocity were calculated in association with total body forces.  However, the doctor who conducted the Burlington Northern study admitted that they could have overestimated the forces from dismounting equipment by as much as 30%.  Kress did not include any data in his report about the forces on the body from climbing on and off rail cars.  He did not bring a copy of any literature containing this data to his deposition.

Kress has not personally measured the forces involved in getting on and off moving railcars, but has only done an "engineering analysis" similar to what the Burlington Northern did in its study.  He is not aware of Plaintiff's body posture when dismounting.  He has only reviewed Plaintiff's deposition, which did not go into detail.

As for ballast, Kress does not know how far Plaintiff walked on ballast, just that other workers walked anywhere from one to three miles a day.  He relies on a study by a "Dr. Andres," but the Andres study took place in a laboratory and did not attempt to determine if there was an association between walking on ballast and any medical condition.  Kress testified about the size of the ballast in the Clinton Yard in 2007, but Plaintiff last worked in 2006.  When asked if any of the studies he relied upon used data gathered regarding conductors at Defendant's railroad,

Kress said no.

Kress is not a medical doctor and has never spoken with any of Plaintiff's doctors. He has never met or spoken with Plaintiff. He has never spoken to any of Plaintiff's supervisors although he "may have" reviewed their depositions. He has never worked for the railroad as a conductor, engineer, or in any other capacity as an employee and has never observed Plaintiff performing any of his job tasks.

**Analysis**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony in federal courts and establishes two general admissibility requirements for expert testimony: "(1) the expert must be qualified, and (2) the subject matter of the expert's testimony must consist of specialized knowledge that will be helpful or essential to the trier of fact in deciding the case." United States v. Lanzotti, 205 F.3d 951, 956 (7th Cir. 2000). The proffered expert's opinion also must be: (1) based upon sufficient facts or data; (2) the product of reliable procedures or methods; and (3) applied reliably to the facts of the case. Fed. R. Evid. 702. Treating physicians are not exempt from the requirements of Rule 702 because "we do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation." O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1105 n.14 (7th Cir. 1994). The United States Supreme Court has emphasized that a district court must act as a gatekeeper in ensuring "that any and all scientific testimony or evidence is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993). The Seventh Circuit has interpreted Daubert to require a district court to undertake a two-step inquiry. O'Conner, 13 F.3d at 1106. The district court must first determine whether the expert's

testimony pertains to scientific knowledge. <u>O'Conner</u>, 13 F.3d at 1106. This task requires a district court to "consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" <u>O'Conner</u>, 13 F.3d at 1106, <u>quoting</u> <u>Daubert</u>, 509 U.S. at 590. Second, the court must determine whether the evidence or testimony is relevant, that is, whether it assists the trier of fact in understanding the evidence or in determining a fact in issue. <u>O'Conner</u>, 13 F.3d at 1106. The reliability and relevance factors are designed to "make certain that an expert, whether basing the testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

The first prong of the two-step gatekeeper inquiry, reliability, focuses on the methodology of the expert. <u>See</u> <u>Clark v. Takata Corp.</u>, 192 F.3d 750, 756-57 (7th Cir. 1999). The expert must substantiate his opinion, and not simply provide the ultimate conclusion without analysis. <u>Clark</u>, 192 F.3d at 756. Either hands-on testing or review of experimental, statistical, or other scientific data gathered by others may suffice as a reasonable methodology for an opinion. <u>Clark</u>, 192 F.3d at 758.

The main case cited by Defendant in support of its contention that the three treating physicians should be barred from providing causation evidence is this court's earlier opinion in <u>Campbell v. CSX Transportation, Inc.</u>, Case No. 08-CV-2045, issued May 21, 2009. In <u>Campbell</u>, the plaintiff claimed that he injured his neck and lower back during his employment with the defendant. The plaintiff saw Dr. George Schoedinger (the same Dr. Schoedinger involved in the present case), who performed surgery on the plaintiff's spine. Schoedinger knew

where the plaintiff worked and testified that the sort of activities the plaintiff engaged in placed stress on the back and neck to a greater extent than someone engaged in sedentary work and that at least a portion of the plaintiff's condition was related to his longstanding exposure to repetitive stresses on his spine. Schoedinger did not, however, conduct an inquiry into the plaintiff's actual work nor did he observe the location where plaintiff worked. He also did not conduct any testing to determine the forces on the spine or neck from activities associated with employment as a railroad conductor nor was he aware of any literature on the subject. Schoedinger was also unaware of the plaintiff's activities outside the railroad. Rather, he made an assumption about the plaintiff's work activities by plaintiff's telling him he was a conductor and Schoedinger's knowledge of what conductors do.

This court granted the motion to bar Schoedinger's testimony under Federal Rule of Evidence 702 and Daubert. This court found that Schoedinger's opinion regarding causation was not based on testing or review of scientific data but was rather based upon speculation and assumption. This court concluded that Schoedinger did not use a methodology sufficient to meet the reliability prong of the Daubert test and excluded the testimony regarding causation.

Further, Defendant also cites to several district court cases in support of his contention that the methodology employed by Kress (and also the doctors) does not support qualifying them to give causation testimony under Rule 702 and Daubert.

One of the main cases relied upon by Defendant is McCarty v. Canadian National/Illinois Central Railroad, 2008 WL 539214 (S.D. Miss. 2008). In McCarty, the plaintiff was a former Illinois Central employee who filed suit under FELA alleging he developed carpal tunnel syndrome (CTS) due to performance of routine tasks associated with his employment with the

railroad.  The defendants challenged the admission of causation testimony from Drs. William

Thomas and Michael Shinnick, who both wanted to testify that the plaintiff's years on the

railroad caused his CTS.  Thomas relied on a differential diagnosis and admitted that he had not

reviewed literature on the causes of CTS in nearly 10-15 years and was unable to cite any peer-

reviewed studies supportive of his opinion and he had not conducted any studies or analyses to

substantiate his views.  He has also not demonstrated that his views had gained general

acceptance in the scientific community.  The court found Thomas's proposed testimony to be

inadequate, as it was a result-oriented opinion that provided no explanation of the facts or

reasoning used in formulating the opinion and merely stated his that his conclusion was based on

examination of the plaintiff and the resulting surgeries, medical records, and professional

experience.  McCarty, 2008 WL 539214, at *3.

Shinnick was an ergonomist, well qualified like Dr. Kress, who investigated the work

conditions at ICR, read various depositions including the plaintiff's, visited the plaintiff's work

station where he weighed, measured, and photographed a track inspector's truck and tools;

reviewed the plaintiff's medical records; and reviewed various articles and ergonomic literature.

Shinnick admitted he was not aware of any threshold or level of exposure to the "risk factors" he

identified in his report, even though he stated that the plaintiff was exposed to risk factors for

CTS as he performed his job.  Shinnick failed to present any evidence as to the amount of

pressure or repetition necessary to cause the plaintiff's injuries.  He did not perform any studies

or investigations as to plaintiff's method of performing his job or as to what reduction in the

length of time or number of repetitions of performing his job would be needed to ensure that

plaintiff did not develop CTS.  The court held Shinnick's testimony did not satisfy Daubert.

McCarty, 2008 WL 539214, at *4.

In Zarecki v. National Railroad Passenger Corp., 914 F.Supp. 1566 (N.D. Ill. 1996), the plaintiff was diagnosed with CTS in 1992 and sued the defendant under FELA. Defendant produced its own ergonomics expert who concluded the railroad had done nothing wrong and that there was no evidence that anything on the job site caused the plaintiff's CTS. Instead of hiring her own expert, the plaintiff simply filed the affidavit of her treating physician, Dr. Farrell, which stated that he had treated plaintiff and reviewed the medical record and, basing his opinion upon a reasonable degree of medical certainty, found that plaintiff's CTS was caused by her work for defendant. The district court rejected Dr. Farrell's affidavit because it was not based on any discernable scientific methodology. Zarecki, 914 F.Supp. at 1574. Farrell's affidavit failed to indicate if he consulted any studies or analyses to support his views nor has he attempted to demonstrate that his views have gained any general acceptance in the scientific community. His conclusions are just based on his own observations, which are insufficient to establish that they are corroborated by the scientific method. Zarecki, 914 F.Supp. at 1574.

In Stasior v. National Railroad Passenger Corp., 19 F.Supp.2d 835 (N.D. Ill. 1998), the plaintiff filed a FELA claim seeking damages for CTS sustained during the course of her employment with the defendant. Defendant moved the court to bar the testimony of Gary Herrin and Michael Shinnick under Rule 702 and Daubert and thus grant summary judgment for failure to produce any evidence to support her FELA claim.

The court qualified Herrin as an expert, but after applying Daubert, rejected his testimony, noting that he did not conduct any tests or cite any scientific or epidemiological studies to ascertain whether the risk factors actually caused the plaintiff's CTS and chronic

tendonitis. Herrin did not thoroughly and accurately quantify the degree of awkward posture which plaintiff allegedly suffered in 1991 and before. Stasior, 19 F.Supp.2d at 849. Herrin did not test or publish for peer-review his hypothesis as to what caused the CTS. While Herrin cited an epidemiological study in support of his opinion that repeated and sustained hand exertions contributed to plaintiff's CTS, he failed to explicitly tie the study to the facts of plaintiff's particular situation. Essentially, Herrin's methodology consisted of identifying risk factors at plaintiff's work place and concluding that these factors caused the CTS. Plaintiff did not present the court with any evidence that Herrin's hypotheses regarding awkward posture and repetition were reviewed, or accepted by his peers. Because the theory and methodology were not tested and subject to peer review, it was impossible to determine the known rate of error of his conclusions. Herrin did not base his proffered testimony on research he conducted independent of this litigation, but rather formulated his opinion expressly for the purpose of testifying. Stasior, 19 F.Supp.2d 849-50.

The court similarly found against the testimony of Dr. Shinnick. Shinnick never observed the workstation plaintiff used in 1991 and before, and made no attempt to measure the awkward posture and repetition which were allegedly present at Stasior's current workstation in order to extrapolate what her pre-1991 conditions were like. Shinnick assumed that because plaintiff was not properly trained in the use of her equipment, the risk must have been there. While Shinnick performed functional capacity and grip tests on plaintiff, he did not cite any peer-reviewed scientific or epidemiological studies tying the results of his tests to the conclusion that awkward posture contributed to plaintiff's CTS. The court also noted Shinnick formulated his opinion expressly for the purpose of testifying, and not independent of the litigation. Stasior,

19 F.Supp.2d at 852.

In support of his position, Plaintiff cites to the Sixth Circuit Court of Appeals case Hardyman v. Norfolk & Western Rwy. Co., 243 F.3d 255 (6th Cir. 2001). In Hardyman, the plaintiff, a conductor and brakeman for the railroad, sued under FELA alleging that as a result of the railroad's negligence he developed CTS during the course of his employment. Hardyman, 243 F.3d at 257. The district court granted summary judgment for the railroad, holding that "[p]laintiff could not establish the causation element of his negligence claim without causation testimony" because the proffered testimony was "conclusory and unsupported by any objective, reliable methodology." Hardyman, 243 F.3d at 259, 261. In that case, a Dr. Linz testified that the plaintiff had CTS and determined the cause of the CTS to be his years of working on the railroad. Linz determined this through "differential diagnosis," in that he has considered all relevant potential causes of the symptoms and then eliminates the alternative causes based on a physical examination, clinical tests, and thorough case history. Hardyman, 243 F.3d at 260-61. The district court, although recognizing that differential diagnosis is an acceptable method of determining causation, seemed to reject that methodology, stating "the expert must have either conducted his own study to determine the causation of the plaintiff's injury, or he must be able to point to scientific or epidemiologic evidence establishing a direct link between the plaintiff's activity and his occupational activity and injury." Hardyman, 243 F.3d at 262.

The Sixth Circuit rejected the reasoning of the district court. The court stated "[w]e further recognize that it makes little sense to require a plaintiff to establish a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad brakemen and where the dose/response relationship or threshold level

will always vary from individual to individual.  Such a requirement essentially would foreclose plaintiffs from recovering for CTS against negligent employers unless their particular job has been the subject of a national, epidemiological study."  Hardyman, 243 F.3d at 265.

Further, the Sixth Circuit held that a jury question can be created even without expert testimony going directly to the question of specific causation.  Hardyman, 243 F.3d at 268. The court held that even if the district court did not abuse its discretion in excluding the plaintiff's treating physicians from testifying as to causation, nothing would preclude the physicians from testifying that the plaintiff did have CTS and as to what they have found, through their experience, generally has caused CTS.  Further, the experts could testify as to: (1) generally accepted risk factors for CTS development; (2) the number of risk factors and the degree to which they were present in the plaintiff's job; and (3) the specific tasks required in each of the plaintiff's job requirements during the course of his employment with the railroad.  Also, the plaintiff himself could testify as to his work and non-work related activities.  Such testimony, even without expert causation testimony, would be adequate to provide a jury with the special expertise necessary to draw a causal inference.  Hardyman, 243 F.3d at 269.

Here, the doctors do not know any specifics about Plaintiff's job duties and they did not attempt to quantify the physical requirements of those jobs.  They do not know the forces involved in any of Plaintiff's work activities, or the forces required to cause any of Plaintiff's alleged injuries.  See Campbell, 2009 WL 1444656, at *1.  They have never been to any of Plaintiff's job sites nor observed Plaintiff's work. See Campbell, 2009 WL 1444656, at *1.  The doctors also do not cite any specific scientific literature to support their causation opinions or any threshold levels for causation, nor have they measured the forces involved.  Even though

Schoedinger "thumbed through" a report, he did not apply any case-specific facts to it. Neither he nor McMullin could provide a meaningful distinction between the prior injury and Plaintiff's current condition to allow for the jury to determine a compensable injury. The doctors were unaware of many of the prior injuries and surgeries undergone by Plaintiff. McMullin was also unaware of any prior knee surgery or the 1989 and 1998 knee injuries and Schoedinger was unaware of the preexisting back injuries. Finally, all the doctors were also unaware that Plaintiff rides an ATV and could not make a definitive determination as to how ATV riding could impact any of Plaintiff's alleged injuries. See Campbell, 2009 WL 1444656, at *1. The doctors' opinions regarding causation were not based on testing or review of scientific data but rather were based upon speculation and assumption. Thus, they did not use a methodology sufficient to meet the reliability prong of the Daubert test and their testimony regarding causation should be excluded. See Campbell, 2009 WL 1444656, at *4.

The focus of Defendant's argument against Kress is the methodology Kress used in reaching his opinion about Plaintiff's cumulative injuries. Defendant argues Kress has offered no minimum threshold or level of the risk factors he lists which would cause the alleged injuries. He has also not quantified the forces involved in the tasks at issue. Other courts have also found that a proffered expert's deviation from the accepted methodology in forming his opinion weighs strongly against a finding of reliability. This court agrees with Defendant.

There was no independent investigation into Plaintiff's work tasks, as Kress's opinion was based on the Plaintiff's own description of his work. See Dukes v. Illinois Central Railroad, 939 F.Supp. 939, 951 (N.D. Ill. 1996). Kress had no evidence of the amount of pressure or repetition necessary to cause the injuries. See McCarty, 2008 WL 539214, at *4. Kress did not

quantitatively measure the Plaintiff's exposure to the relevant risk factors in performing his job duties.  See <u>Stasior</u>, 19 F.Supp.2d at 849.  Further, Kress did not apply the facts of the Plaintiff's case to existing studies so that the opinion could be tested or peer-reviewed.  See <u>Zarecki</u>, 914 F.Supp. at 1574.

Kress developed opinions without citing or taking measurements of the forces imposed on Plaintiff when Plaintiff was performing the tasks at issue and has altogether failed to provide evidence of the actual force levels at work in Plaintiff's work environment.  His conclusions are based simply on his own speculation as to the details of Plaintiff's work, which is insufficient to establish that his views are supported by a scientifically reliable method.  See <u>Zarecki</u>, 914 F.Supp. at 1574.

Plaintiff raises an argument that any perceived issues regarding the physician's asserted lack of firsthand knowledge would only serve as a basis for Defendant to challenge the weight of their opinions, but that it is not reasonable to strike their opinions.  See <u>Commonwealth Ins. Co. v. Titan Tire Corp.</u>, 2005 WL 3479031, *1 (C.D. Ill. 2005).  However, the court, as noted above, has found the causation opinions of the doctors and Kress to be based on speculation, and the court, as an evidentiary gatekeeper, does not desire the jury to make an inference or judgment based on speculation.  Further, Plaintiff cites extensively to <u>Hardyman</u> in support of his position, but the court would point out that the doctor in <u>Hardyman</u> made a differential diagnosis, which is not present in this case.  Here, the treating physicians and Kress could not make a differential diagnosis as they did not have any knowledge of Plaintiff's out of work activities, such as ATV riding.  Also, the Seventh Circuit has as of yet declined to adopt the more expansive approach to the admissibility of causation testimony as evidenced by the Sixth Circuit in <u>Hardyman</u>.

For the foregoing reasons, Defendant's Motion to Bar Plaintiff's Physicians from Giving

Expert Causation Opinions (#38) and Motion to Bar the Expert Opinion of Tyler Kress (#49) are both GRANTED in full.

<h2 style="text-align:center">II.       MOTION FOR SUMMARY JUDGMENT</h2>

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial.  Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).

In its Motion for Summary Judgment for Lack of Causation Evidence (#42), Defendant argued that Plaintiff's claims fail because has failed to produce any reliable evidence that Defendant's negligence or violation of the alleged regulations and statutes caused his injuries. Defendant argues Plaintiff has failed to disclose any admissible expert opinion testimony regarding the cause of his multiple alleged cumulative trauma injuries.  Without admissible expert opinion testimony showing that Plaintiff's working conditions caused his alleged injuries, there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law.

Plaintiff has sued Defendant under FELA, which enables railroad employees to recover for injuries "resulting in whole or in part from the negligence of the railroad or its agents." Campbell v. Nat'll R.R. Passenger Corp., 2008 WL 4367450, at *2 (N.D. Ill. 2008), citing 45 U.S.C. § 51.  Because FELA is not a strict liability statute, plaintiffs must still prove the traditional common law elements of negligence, including (1) foreseeability; (2) duty; (3)

breach; and (4) causation.  <u>Williams v. Nat'll R.R. Passenger Corp.</u>, 161 F.3d 1058, 1062 (7th Cir.

1998); <u>Fulk v. Ill. Cent. R.R. Co.</u>, 22 F.3d 120, 124 (7th Cir. 1994); <u>Campbell</u>, 2008 WL

4367450, at *2. "Critical to the FELA plaintiff's case is some evidence of a causal connection

between the employer's negligence and the plaintiff's injury."  <u>Campbell</u>, 2008 WL 4367450, at

*3, <u>citing</u> <u>Schmaltz v. Norfolk & W. Ry. Co.</u>, 896 F.Supp. 180, 182 (N.D. Ill. 1995).  "[U]nless

the connection is a kind that would be obvious to laymen, such as a broken leg from being struck

by an automobile," expert testimony is required to establish the causal connection between the

railroad's negligence and the injury at issue.  <u>Campbell</u>, 2008 WL 4367450, at *3,

<u>quoting</u> <u>Schmaltz</u>, 896 F.Supp. at 182.

     In this case, this court has ruled that Plaintiff's proffered expert testimony on the issue of

causation is inadmissible.  This court further concludes that the causal connection between

Defendant's purported negligence and Plaintiff's alleged neck and back injuries are less than

clear to a layman.  See <u>Campbell</u>, 2008 WL 4367450, at *3.  Plaintiff has advanced the argument

that even if the causation opinions have been struck, the jury should still be allowed to make an

inference about causation from the facts presented concerning Plaintiff's work environment and

his alleged injuries.  See <u>Hardyman</u>, 243 F.3d at 269.  However, as explained above, this court

has declined to follow the <u>Hardyman</u> case and the Seventh Circuit has not incorporated the

<u>Hardyman</u> analysis into its rulings.  If the court were to allow Plaintiff to present its case to a

jury, the jury would be making inferences based on speculation, and that the court cannot allow a

jury to do, as it would violate the court's function as a gatekeeper.  Therefore, because Plaintiff

has failed to produce any admissible evidence to support a necessary element of his FELA claim,

summary judgment is warranted.  See <u>Doty v. Ill. Cent. R. Co.</u>, 162 F.3d 460, 462-63 (7th Cir.

1998); <u>Campbell</u>, 2008 WL 4367450, at *4; <u>Stasior</u>, 19 F.Supp.2d at 853; <u>Zarecki</u>, 914 F.Supp.

at 1575; <u>Schmaltz</u>, 896 F.Supp. at 183.

### III.   REMAINING MOTIONS

Because this court has concluded that Defendant is entitled to judgment as a matter of law on Plaintiff's Complaint, this court does not need to consider Defendant's Motion for Partial Summary Judgment Regarding Ballast Size (#40), Defendant's Partial Motion for Summary Judgment (#29), or the Motions in Limine filed by Plaintiff (#68) and Defendant (#70). Accordingly, these Motions are MOOT.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Bar Plaintiff's Physicians from Giving Expert Causation Opinions (#38) and Motion to Bar the Expert Opinion of Tyler Kress (#49) are GRANTED in full.

(2) Defendant's Motion for Summary Judgment for Lack of Causation Evidence (#42) is GRANTED.  Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's Complaint (#1).

(3) Based upon this ruling, the remaining motions filed by Defendant (#29), (#40), (#70) and Plaintiff (#68) are MOOT.

(4) This case is terminated.  The status conference set for April 16, 2010, at 3:30 pm is hereby VACATED.

ENTERED this 8th  day of January, 2010

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE